William A. COX and Julie L. Cox,
Plaintiffs–Appellants,

v.

Mark A. CLARK and Amy L. Clark,
Defendants–Respondents.

No. 21114.

Missouri Court of Appeals,
Southern District,
Division Two.

June 16, 1997.

Motion for Rehearing or Transfer
Denied July 7, 1997.

Application to Transfer Denied
Aug. 19, 1997.

John R. Lewis, Lewis & Moon, L.L.P., Springfield, for plaintiffs-appellants.

Ken D. Rogers, David C. Vaughn, Fredrick, Rogers & Vaughn, P.C., Springfield, for defendants-respondents.

SHRUM, Judge.

William and Julie Cox (Plaintiffs) appeal from a summary judgment denying their claims for damages arising out of their purchase of residential real estate from Mark and Amy Clark (Defendants).[1] Count II of Plaintiffs' petition was based on allegations of a breach of an implied warranty of habitability.[2]

At issue on appeal is whether, considering the record before the trial court, there exists a genuine issue of material fact concerning Plaintiffs' allegations that Defendants breached an implied warranty of habitability. We answer that question in the negative and affirm the judgment of the trial court.

FACTS

From the pleadings, depositions, and other exhibits, the following facts emerge. Prior to October 1990, Defendants lived in Altoona, Pennsylvania, where Mark worked as a paving superintendent for a construction firm.

---

1. Collectively, we refer to William A. Cox and Julie L. Cox as "Plaintiffs." When necessary to refer to them individually, we call them William or Julie. In referring to both Mark A. Clark and Amy L. Clark, we call them Defendants. Individually, we call them Mark or Amy.

2. Plaintiffs' petition was in two counts. Under Count I they sought damages based on allegations of fraud. On appeal, Plaintiffs do not raise an issue regarding the propriety of summary judgment on the fraud claim. Thus the Count I claim is deemed abandoned. *See Mobley v. Copeland,* 828 S.W.2d 717, 718 n. 1 (Mo.App. 1992).

In the first six years of their marriage, Defendants moved at least six times. In October 1990, Mark quit his job in Pennsylvania and Defendants moved to Springfield, Missouri. Defendants' purpose for moving was so that they could settle down in a home and raise their daughters "in a stable environment."

Initially, Defendants moved in with Amy's parents, Mr. and Mrs. Larry Bangle. This living arrangement continued until the subject house was completed in July 1991, whereon Defendants moved into their new house.

After arriving in Springfield, Defendants looked at several homes offered for sale. Amy's father, Larry Bangle, (Bangle) then offered to build a house for them. Defendants agreed and on November 9, 1990, they bought two lots on which the house in question was ultimately built. Near that same time, Bangle prepared a house plan for Defendants. Defendants never signed a contract with Bangle for any of his work and he was not paid for the house plans or serving as general contractor.

On November 16, 1990, Bangle applied to the City of Springfield for a permit to build a house on the lots purchased by Defendants. On the application, Bangle listed himself as "contractor." Bangle initially paid the permit fee but Defendants reimbursed him for that expense.

Before this project, Bangle had drawn plans for approximately 20 homes and built other homes and a church. However, Bangle's full-time job, both before and during this construction, was as an artist for the Assemblies of God Publishing Company where he illustrated Sunday school literature.

Regarding Bangle's duties as general contractor, Mark testified: "He [Bangle] took care of all the people that were working on [the house.]" Amy testified that people who worked on the house were hired through her dad. She explained that "if they came to the house to talk about the job he [Bangle] was there and we ... discussed if they were good or not." If Bangle believed the prospective workers were good, they were put to work and Defendants paid them. Bangle explained his role as follows: "I acted as the general contractor and/or builder. I coordinated the sub-contractors and the purchase of the materials.... I hired Mr. Bill Jones to act as the foreman to assist in overseeing the construction."

In his affidavit, William Jones stated:

"[I]n October 1990, Larry Bangle hired me to construct a house at 3424 S. Western Court, Springfield.... [D]uring construction of the home, I acted as framer/job foreman. I framed the house and ordered the materials that were used. I was responsible for overseeing the daily work done by sub-contractors to report to Larry Bangle."

Regarding labor costs, Defendants relied on the workers to accurately report their hours and paid them based on their representations. Likewise, Defendants paid whatever material bills were submitted to them by the subcontractors. Defendants—not Bangle—paid all construction costs, either directly to the material supplier, to sub-contractors, or to workmen.

Financing for this house was provided by Mark's parents. As Defendants went through construction phases, they would telephone Mark's parents to report how much money was needed. His parents would then fund the request, Defendants would deposit the money in their account, and then pay construction bills therefrom. These financing arrangements were never reduced to writing and Defendants never gave Mark's parents a note or deed of trust on the property.

Defendants moved into the house on July 3, 1991, and lived there until they closed the sale to Plaintiffs on February 24, 1993. A certificate of occupancy was not issued until after Plaintiffs bought the property. However, Paul Buffington, who worked as a building inspector for Springfield in 1991, testified via affidavit that on July 2, 1991, he gave Defendants a verbal occupancy permit. Soon thereafter, Buffington resigned and moved to another location; hence, he had "no knowledge why the certificate of occupancy was not issued pursuant to [his] final inspection ... and verbal occupancy permit."

In affidavits by Defendants, they stated that they built the house intending it as their permanent residence and without intent to resell it when completed, that this was not a commercial endeavor on their part, and that they had never built a home for commercial sale. In a separate affidavit, Mark listed several "extras" that he and Amy requested during construction. These "extras" were designed to serve Defendants' personal needs. Mark asserted that both he and Amy "were thrilled with our new home until it was broken into and robbed in November, 1991." Both Defendants stated that in November 1991, their house was burglarized and numerous items were stolen. As a result of this incident, Wife "became extremely uncomfortable" with this house and "refused to stay in the home alone at night." Mark placed steel bars on the basement windows where the thieves entered, but Amy's anxieties were not allayed. Ultimately, Amy's fears of another burglary led Defendants to offer the property for sale.

Defendants first listed this property for sale through a realtor in February 1992. Later, they listed with two other firms. The third realtor finally sold Defendants' house to Plaintiffs on February 24, 1993. Prior to closing, Plaintiffs had the opportunity to have the home professionally inspected before closing but did not do so. Moreover, Plaintiffs never discussed the home with Defendants before closing nor did they ask to do so. After Plaintiffs purchased the home, they became aware of certain problems with the house that led to this litigation. Plaintiffs' second amended petition alleged two counts, misrepresentation and breach of an implied warranty of habitability.

Defendants moved for summary judgment on January 24, 1996. On March 13, 1996, the court granted Defendants' motion for summary judgment as to both counts. This appeal followed.

## DISCUSSION AND DECISION

*Point I:*

Rule 74.04(c)(3) provides that a summary judgment shall be entered if both the motion for summary judgment and the response to that motion demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The grant of a summary judgment is a question of law; therefore, appellate review of granting summary judgment is essentially de novo. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376[4,6] (Mo. banc 1993). On appeal, the court will review the record in the light most favorable to the party against whom judgment was entered. *Id.* at 376[1]. An appellate court will accord the nonmoving party the benefit of all reasonable inferences from the record. *Id.* at 376[3].

Plaintiffs' first point on appeal asserts that the trial court erred in granting summary judgment in favor of Defendants since the trial court misapplied the law regarding the implied warranty of habitability. We disagree.

In 1972, the Supreme Court of Missouri recognized an action for a breach of an implied warranty of habitability by the purchaser of a new home against a vendor-builder regarding latent defects. *Smith v. Old Warson Dev. Co.*, 479 S.W.2d 795 (Mo.banc 1972). The factual context in which the *Old Warson* court used the term "vendor-builder" and the intended breadth of the implied warranty of habitability are indicated by this excerpt from that opinion:

> "The home here was new and *was purchased from the company which built it for sale.* The defect here was clearly latent and not capable of discovery by even a careful inspection. Defendant was the developer of the subdivision in which the house was located, and built this home to demonstrate to the public the type of quality residence which could be erected in the subdivision. It was held out to the public as 'luxurious' and was shown as a model to the public. Common sense tells us that a purchaser under these circumstances should have at least as much protection as the purchaser of a new car, or a gas stove, or a sump pump, or a ladder." (emphasis added) (notes omitted).

*Id.* at 799.

Since the seminal decision in *Smith v. Old Warson Dev. Co.*, Missouri courts have de-

234

fined the parameters for actions involving a breach of an implied warranty of habitability. *See Armbruster & Co. v. Hayden Co.-Builder Developer, Inc.,* 622 S.W.2d 704 (Mo.App. 1981); *Allison v. Home Savings Ass'n of Kansas City,* 643 S.W.2d 847 (Mo.App.1982); and *Schulze v. C & H Builders,* 761 S.W.2d 219 (Mo.App.1988).

This court, in particular, has found that the implied warranty of habitability is a viable theory of recovery when the primary purpose for building the house is to sell it. *See Snowden v. Gaynor,* 710 S.W.2d 481 (Mo. App.1986); *Mobley v. Copeland,* 828 S.W.2d at 717; *Hines v. Thornton,* 913 S.W.2d 373 (Mo.App.1996). Thus, in *Mobley* and *Hines* we held that to prevail on such theory it is essential that the sale be " 'commercial rather than casual or personal in nature.' " *Mobley,* 828 S.W.2d at 729 (quoting *Klos v. Gockel,* 87 Wash.2d 567, 554 P.2d 1349, 1352[1] (Banc 1976)); *Hines,* 913 S.W.2d at 375. In *Snowden,* we found the implied warranty remedy was viable where the house in question was obviously "built on speculation." 710 S.W.2d at 486. Even "a first-time builder-seller may be 'in the business of building' for purposes of impliedly warranting his work, if his primary reason for constructing the house is to resell it." *Mobley,* 828 S.W.2d at 729 (quoting *Mazurek v. Nielsen,* 42 Colo.App. 386, 599 P.2d 269, 271[4] (1979)).

■ Here, through affidavits, deposition testimony, and pleadings, Defendants stated that they intended this house to be their personal residence and not a commercial enterprise. They further stated that their primary reason for building the house was personal in nature and not to resell it. Plaintiffs offered no verified denial or counter-affidavit

to this evidence; therefore, it is deemed admitted. *Mobley,* 828 S.W.2d at 729. Consequently, facts underlying Defendants' right to judgment were left undisputed and summary judgment was proper. *Id.* See *ITT Commercial Finance,* 854 S.W.2d at 381.

Attacking this notion, Plaintiffs point to the fact that Defendants had listed the house with three realtors before the final occupancy permit was issued in May 1993. However, Plaintiffs never further develop this argument nor explain it. Moreover, Plaintiffs ignore the affidavit of Paul Buffington, the building inspector who stated that he issued an oral occupancy permit in July 1991 after Defendants had corrected discrepancies discovered during an initial inspection. Buffington further stated that he did not know why the written occupancy permit was not issued shortly after his second inspection. Plaintiffs offer nothing to counter Buffington's affidavit. In addition, both Defendants stated in affidavits that a burglary of this home engendered such fear and anxiety in Amy that they ultimately decided to sell the house. Plaintiffs, again, offer no verified denial or counter-affidavit on what prompted Defendants to sell their house; hence, those facts are deemed admitted. *Mobley,* 828 S.W.2d at 729. Under the circumstances, we cannot perceive how the belated occupancy permit or Defendants' listing of the property *after* the burglary show there is a genuine issue for trial.[3]

Plaintiffs argue in their brief that "whether the home was built for commercial sale is immaterial to the application of the implied warranty of habitability under the *Old Warson* ... standard." This argument ignores the clear language of both *Mobley* and

3. The house in question was located in Prairie View Heights Third Addition. In response to Defendants' summary judgment request, Plaintiffs declared that within 21 days of the sale of the subject home, Defendants bought a lot in Prairie View Heights Fourth Addition and built a house thereon. They attached a photocopy of a deed whereby Defendants purportedly acquired title to the second tract. However, the photocopy was not certified by the recorder of deeds nor was it otherwise identified in a manner that would have rendered it admissible or usable at trial. During oral argument to this court, Plaintiffs asserted that Defendants' purchase of lots in

the same subdivision refuted Defendants' evidence that the sale of the subject home was prompted by Amy's great fear of a repeat burglary. However, such argument fails for two reasons: First, Plaintiffs' response was not verified and second, only evidentiary materials that are admissible and usable at trial can avoid a summary judgment. *Partney v. Reed,* 889 S.W.2d 896, 901[11] (Mo.App.1994). Here, the deed photocopy would not be admissible at trial. Standing alone, Plaintiffs' unverified response and the inadmissible photocopy of a deed were not probative of the material issue for which Defendants now argue.

*Hines.* Moreover, such argument wholly ignores the circumstances present in *Old Warson,* i.e., a display home built by a developer specifically intended for resale.

Plaintiffs' failure to show a factual issue concerning Defendants' status as casual or personal builders—in contrast to a builder whose primary reason for constructing a house is to resell it—is fatal to their claim. The trial court did not err in granting summary judgment. Point I is denied.

*Point II:*

Plaintiffs' second point relied on reads as follows:

> "The trial court erred and abused it's [sic] discretion in it's [sic] award of summary judgment in favor of Respondents ..., in that the trial court's summary judgment is in violation of Rule 74.04(c)(3) because there was no showing by the Respondents, as the moving party, that there was no genuine issue as to any material fact for the reason there is a factual dispute with regard to the Respondent's contention that Larry Bangle was the builder of the home.
>
> Rule 74.04(c)(3)."

 As purported authority for this point, Plaintiffs only cite to one rule of civil procedure, which, standing alone, is not a sufficient citation to authority. *See Cook v. Wadlington,* 821 S.W.2d 864, 865 (Mo.App. 1991). Where a point is not one of first impression, not a matter of logic, nor a matter of language construction, citation to authority is appropriate. *Steenrod v. Klipsch Hauling Co., Inc.,* 789 S.W.2d 158, 166 (Mo. App.1990); *Ortmeyer v. Bruemmer,* 680 S.W.2d 384, 396 (Mo.App.1984). A point relied on unsupported by citation of relevant authority is deemed abandoned. *Steenrod,* 789 S.W.2d at 166; *Bishop v. Bishop,* 618 S.W.2d 261, 263[4] (Mo.App.1981). Therefore, we decline to address this point.

The judgment is affirmed.

CROW, P.J., and PARRISH, J., concur.