Lisa GRISSOM, Plaintiff–
Appellant/Respondent,

v.

FIRST NATIONAL INSURANCE AGENCY and Tri–Star of Sikeston, Inc., Defendants-Respondents,

and

Loy Welker, Defendant–
Respondent/Cross–
Appellant.

Nos. SD 30821, SD 30822.

Missouri Court of Appeals,
Southern District,
Division Two.

March 30, 2012.

Motion for Rehearing or Reconsideration
and
Transfer Denied April 20, 2012.

Application for Transfer
Denied May 29, 2012.

John P. Clubb, Cape Girardeau, MO, for Appellant–Respondent.

James E. Spain, Poplar Bluff, MO, for Respondent/Cross–Appellant.

JEFFREY W. BATES, Judge.

Lisa Grissom (Grissom) was employed as an insurance salesperson by Loy Welker, owner and president of Tri–Star of Sikeston, Inc. (hereinafter referred to individually as Welker or Tri–Star and collectively as Respondents).[1] Following Grissom's termination, she brought suit against Respondents for, *inter alia*, sexual harassment, retaliation and wrongful discharge. Respondents moved for summary judgment on Grissom's sexual harassment claims on the basis that the claims were time-barred. *See* § 213.075.1.[2] The trial court agreed and granted summary judgment on Grissom's sexual harassment claims. Grissom's retaliation and wrongful discharge claims went to trial, and the jury found in Grissom's favor against Welker only. Grissom was awarded actual and punitive damages, costs and a portion of her attorney's fees.

On appeal, Grissom contends the trial court erred by: (1) granting summary judgment on her sexual harassment claims; and (2) awarding her only a portion, rather than all, of her attorney's fees. In Welker's cross-appeal, he contends the trial court erred by refusing to grant Respondents' motions for directed verdict at the close of all of the evidence and for judgment notwithstanding the verdict (JNOV) because: (1) the evidence was insufficient to support the retaliation and wrongful discharge claims; and (2) the evidence was insufficient to submit the punitive damages claim to the jury. We find no merit in either of Welker's points in his cross-appeal, or in Grissom's second point concerning her attorney's fees. We do, however, find merit in Grissom's first point. Because the trial court erred in granting summary judgment on Grissom's sexual harassment claims, that portion of the judgment is reversed, and the cause is remanded for further proceedings. In all other respects, the judgment is affirmed.

*Grissom's Appeal*

In Grissom's first point, she challenges the trial court's grant of summary judgment on her sexual harassment claims. She argues that there is a genuine issue of material fact concerning the timeliness of her claims that precludes summary judgment for Respondents.

■ A summary judgment can only be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 74.04(c)(6); *Hitchcock v. New Prime, Inc.*, 202 S.W.3d 697, 699 (Mo.App.2006); *Lindsay v. Mazzio's Corp.*, 136 S.W.3d 915, 919 (Mo.App.2004). Appellate review is *de novo*. *Wilson v. Rhodes*, 258 S.W.3d 873, 875 (Mo.App.2008). Consequently, this Court does not defer to the trial court's

---

1. At all times relevant herein, Tri–Star was doing business under the fictitious name of First National Insurance Agency.

2. All references to statutes are to RSMo (2000). All references to rules are to Missouri Court Rules (2011).

decision to grant summary judgment. *Barekman v. City of Republic*, 232 S.W.3d 675, 677 (Mo.App.2007). Instead, we use the same criteria the trial court should have employed in initially deciding whether to grant Respondents' motion. *Id.*; *see ITT Commercial Finance Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

As our Supreme Court explained in *ITT*, Rule 74.04 distinguishes between a motion for summary judgment filed by a "claimant" and by a "defending party." *ITT*, 854 S.W.2d at 380. Here, Respondents were the defending parties.

> [A] "defending party" may establish a right to judgment by showing (1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense.

*Id.* at 381 (italics in original); *see Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 58–59 (Mo. banc 2005). "The moving party bears the burden of establishing a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment." *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 685 (Mo. banc 2009). Because summary judgment is "an extreme and drastic remedy," we exercise great caution in affirming it because the procedure cuts off the opposing party's day in court. *ITT*, 854 S.W.2d at 377.

Appellate review is based upon the record submitted to the trial court. *Sexton v. Omaha Property and Cas. Ins. Co.*, 231 S.W.3d 844, 845 (Mo.App.2007). We view the record in the light most favorable to the party against whom judgment was entered, and we accord that party the benefit of all inferences which may reasonably be drawn from the record. *ITT*, 854 S.W.2d at 376; *see Hill v. Ford Motor Co.*, 277 S.W.3d 659, 662 n. 3 (Mo. banc 2009). "A genuine issue of material fact" exists where the record contains competent evidence that two plausible, but contradictory, accounts of essential facts exist. *Amusement Centers, Inc. v. City of Lake Ozark*, 271 S.W.3d 18, 19 (Mo.App.2008). "Summary judgment seldom should be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence." *Hill*, 277 S.W.3d at 664. Summary judgment should not be granted unless the evidence could not support any reasonable inference for the non-moving party. *Id.*; *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. banc 2007). The following summary of facts has been prepared in accordance with these principles.[3]

In January 2003, Grissom was hired to work at Tri–Star's Sikeston, Missouri office. Tri–Star is a corporation organized and registered to do business under Missouri law to offer and sell commercial and residential insurance products. Welker was the sole owner and ultimate decision-maker for Tri–Star during the entire time period relevant to Grissom's claims.

According to Grissom, she was subjected to sexual harassment by Welker while employed at Tri–Star. She hand-delivered a letter (hereinafter, the complaint letter) on

---

3. Our summary of the facts is gleaned from the statements of undisputed material facts in Respondents' motion for summary judgment and Grissom's response. *See Shellabarger v. Shellabarger*, 317 S.W.3d 77, 79 (Mo.App. 2010).

July 22, 2005, from her attorney to Welker asking him to stop sexually harassing Grissom. Welker, however, has repeatedly and consistently denied under oath that he ever received the complaint letter. Welker also has denied that he sexually harassed Grissom. Shortly after July 22, 2005, Welker transferred Grissom to a branch office in Dexter, Missouri. On January 18, 2006, exactly 180 days after Grissom said that she delivered the complaint letter to Welker, he directed two other employees to fire Grissom. The employees did so, and Grissom was terminated on that date.

On May 1, 2006, Grissom filed a complaint of sexual harassment with the Missouri Commission on Human Rights (MCHR) against Respondents. In the complaint, Grissom alleged that most recent or continuing discrimination was her discharge on January 18, 2006.

On January 22, 2007, Grissom received a "Notice of Right to Sue" from the MCHR on her sexual harassment claim.[4] On April 13, 2007, Grissom filed suit against Respondents and later filed an eight-count first amended petition. Insofar as relevant here, the first amended petition alleged sexual harassment by Welker (Count I) and Tri–Star's liability for Welker's sexual harassment (Count II). Respondents asserted, as an affirmative defense, that Grissom's sexual harassment claims were time-barred pursuant to § 213.075. In relevant part, this statute states:

Any person claiming to be aggrieved by an unlawful discriminatory practice may make, sign and file with the commission a verified complaint in writing, within one hundred eighty days of the alleged act of discrimination, which shall state the name and address of the person alleged to have committed the unlawful discriminatory practice and which shall set forth the particulars thereof and such other information as may be required by the commission. The complainant's agent, attorney or the attorney general may, in like manner, make, sign and file such complaint.

§ 213.075.1.

In September 2009, Respondents moved for summary judgment on the sexual harassment claims in Counts I and II, contending that said claims were time-barred pursuant to § 213.075.1. Respondents argued that Grissom did not file her sexual harassment claim within 180 days of the alleged act of discrimination. To support the summary judgment motion, Respondents relied upon Grissom's deposition testimony that the sexual harassment by Welker stopped after she delivered the letter from her attorney sometime around July 22, 2005.

In Grissom's response, she specifically denied that "[a]ll alleged sexual harassment stopped on or about July 22, 2005." She set out additional facts that remained in dispute, including that: (1) her discharge on January 18, 2006, was the most recent or continuing discrimination by Respondents; and (2) Welker had denied under oath that he ever received the letter from Grissom's attorney.[5] The materials supporting Grissom's statement of additional facts included her original MCHR complaint form, the MCHR investigative reports, her affidavit and portions of depo-

---

4. Grissom had also filed a complaint of retaliation with the MCHR and the Equal Employment Opportunity Commission (EEOC) against Respondents. She received a "Notice of Right to Sue" on that claim from both the MCHR and EEOC on January 22, 2007 and February 21, 2007, respectively.

5. In a later filing, Respondents reasserted their position that no letter from Grissom's attorney had ever been delivered to Respondents.

sitions from herself and two other employees. One of those employees testified that he believed Welker's sexual harassment of Grissom was a cause of her termination. The trial court granted summary judgment to Respondents on Grissom's sexual harassment claims under Counts I and II of her first amended petition.

On appeal, Grissom contends the trial court erred in granting Respondents' motion for summary judgment. Grissom argues that there is a genuine issue of material fact as to whether her discharge by Respondents was an act of discrimination that was connected to Welker's prior sexual harassment of Grissom. We agree that this genuine issue of material fact precludes summary judgment for Respondents on their affirmative defense.

The Missouri Human Rights Act (MHRA) prohibits an employer from discriminating against an individual "with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, national origin, sex, ancestry, age or disability[.]" § 213.055.1(1)(a). As noted above, an individual alleging unlawful employment discrimination must file a complaint with the MCHR within 180 days of the alleged act of discrimination. § 213.075.1. "The filing requirements are subject to the continuing violation exception, which permits a plaintiff to recover for acts of discrimination occurring prior to the 180–day filing period if the discrimination is a series of interrelated events." *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 685 (Mo. banc 2009); *Pollock v. Wetterau Food Distribution Group*, 11 S.W.3d 754, 763 (Mo.App.1999). In this case, the statutory period began 180 days prior to the filing date of the complaint on May 1, 2006, which is on November 2, 2005. *See, e.g., Wallingsford*, 287 S.W.3d at 685.

Under the continuing violation theory, "a victim of discrimination may pursue a claim for an act occurring prior to the statutory period, if she can demonstrate the act is part of an ongoing practice or pattern of discrimination by her employer." *Pollock*, 11 S.W.3d at 763. In *Pollock*, the eastern district of this Court explained that a plaintiff must establish two elements to take advantage of the continuing violation theory:

First, she must demonstrate that at least one act occurred within the filing period. Further, she must establish that the harassment is a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination. Once the plaintiff has alleged sufficient facts to support the use of the continuing violation theory, the 180–day filing period becomes irrelevant. She may then offer evidence of the entire continuing violation.

*Id.* (citations omitted); *see Thompson v. Western–Southern Life Assur. Co.*, 82 S.W.3d 203, 207 (Mo.App.2002). With respect to the first element, Grissom alleged at least one act occurred within the statutory filing period—her termination occurring on January 18, 2006, well within the filing period between November 2, 2005 and May 1, 2006.

With respect to the second element, Grissom presented sufficient facts from which a reasonable fact-finder could infer that Grissom's termination was a part of a series of interrelated events, rather than an isolated or sporadic act of intentional discrimination. Viewing the facts and reasonable inferences favorable to Grissom as we must, a reasonable fact-finder could infer: (1) Grissom was subjected to sexual harassment by Welker; (2) Grissom did not respond to those advances by Welker; (3) Respondents never received the letter from Grissom's attorney requesting Welk-

er to stop sexually harassing Grissom; (4) Welker transferred Grissom to a branch office shortly after July 22, 2005; (5) Welker did so to punish Grissom for not responding favorably to Welker's sexual advances; and (6) for the same reason, Welker later decided to terminate Grissom on January 18, 2006. Based on our careful review of the record, the facts and the reasonable inferences viewed most favorably to Grissom would support these inferences and preclude summary judgment for Respondents. *See, e.g., Hill v. Ford Motor Co.*, 277 S.W.3d 659, 667 (Mo. banc 2009) (reversing summary judgment on a sexual harassment claim where plaintiff presented sufficient evidence that her adverse treatment was in direct response to her refusal of her supervisor's sexual advances).

These inferences are particularly appropriate in this case because Respondents have repeatedly and consistently denied that they ever received the complaint letter. Viewing the record most favorably to Grissom, we accept this as true for the purpose of reviewing the summary judgment ruling. Because Respondents deny that they ever received the complaint letter, a reasonable fact finder could infer that Grissom was not terminated in retaliation for submitting the complaint letter to Respondents. Instead, a reasonable factfinder could infer that Grissom's transfer and eventual firing constituted a continuing course of conduct by Welker to punish Grissom for spurning his sexual advances. In short, Welker's motive for transferring and later firing Grissom are directly at issue here. "Summary judgment is particularly inappropriate when the underlying issue is one of state of mind, motivation, intent or some other subjective fact." *Barekman v. City of Republic*, 232 S.W.3d 675, 682 (Mo.App.2007). We are reminded of our Supreme Court's admonition in *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814 (Mo. banc 2007) that

"[s]ummary judgment should seldom be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence. Summary judgment should not be granted unless evidence could not support any reasonable inference for the non-movant." *Id.* at 818; *Hill*, 277 S.W.3d at 664; *Barekman*, 232 S.W.3d at 682. This is not a case where the evidence could not support any reasonable inference for the non-movant. *See, e.g., Barekman*, 232 S.W.3d at 682. We agree with Grissom that the motivation for her transfer and termination creates a genuine issue of material fact as to whether these events were part of a continuing series of interconnected acts of discrimination arising out of Welker's alleged sexual harassment of Grissom. Under such circumstances, a summary judgment for Respondents cannot be upheld. *See, e.g., Daffron v. McDonnell Douglas Corp.*, 874 S.W.2d 482, 486 (Mo.App.1994) (reversing a summary judgment that was granted on the ground that the limitation period had expired because there was a genuine issue of material fact as to that issue). For all these reasons, the trial court erred in granting summary judgment on Grissom's sexual harassment claims. Grissom's first point is granted.

 In Grissom's second point, she contends the trial court abused its discretion in awarding her only $84,007.50 in attorney's fees, rather than the $146,500 she requested. Section 213.111.2 provides that the court "may award court costs and reasonable attorney fees to the prevailing party...." *Id.* The determination of reasonable attorney's fees is "in the sound discretion of the trial court and shall not be reversed unless the amount awarded is arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration." *Alhalabi v.*

*Missouri Dept. of Natural Resources*, 300 S.W.3d 518, 530 (Mo.App.2009). In addition, "[t]he trial court is considered an expert on the issue of attorneys' fees such that, in the absence of a contrary showing, the trial court is presumed to know the character of the attorneys' services rendered in duration, zeal, and ability." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 878 (Mo.App.2009). Grissom argues that the trial court provided no basis for reducing her request for attorney's fees, and that there is nothing in the record to contradict the evidence that her requested attorney's fees were reasonable. We disagree.

In determining reasonable attorney's fees in human rights cases, among the factors a court might consider is "the extent to which a plaintiff prevailed on some claims and not on others[.]" *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 523–24 (Mo. banc 2009). In addition to the two counts concerning sexual harassment, Grissom's first amended petition contained six additional counts: retaliation claims against Welker and Tri–Star, respectively; wrongful discharge; failure to provide a service letter to Grissom; defamation; and intentional infliction of emotional distress. Grissom's retaliation and wrongful discharge claims were tried to a jury, which found in her favor only with respect to Welker. The trial court directed verdicts against Grissom on her counts for failure to provide a service letter and defamation, and Grissom chose not to submit the count on intentional infliction of emotional distress. Thus, Grissom ultimately prevailed on only two of the eight counts in her first amended petition. It was appropriate for the trial court to consider that fact in determining an appropriate attorney's fee award for Grissom.

Based upon our review of the record, the trial court's determination is not so "arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration." *Alhalabi*, 300 S.W.3d at 530. Consequently, we find no abuse of discretion in Grissom's attorney's fee award. *See, e.g., Gilliland*, 273 S.W.3d at 523–24 (no abuse of discretion in reducing attorney's fees from the requested $170,149.50 to $22,000 considering the claim succeeded upon below).[6] Accordingly, Grissom's second point is denied.

### Welker's Cross Appeal

In Welker's first point, he contends the trial court erred in denying his motion for directed verdict at the close of all of the evidence and his motion for JNOV because Grissom's claims of retaliation and wrongful discharge are not supported by sufficient evidence. Our review of the trial court's denial of a motion for a directed verdict and a motion for JNOV is essentially the same. *Hadley v. Burton*, 265 S.W.3d 361, 374 (Mo.App.2008). Our task is to determine whether Grissom made a submissible case against Respondents. *See id.* "A directed verdict is a drastic action to be taken sparingly and only where reasonable persons in an honest and impartial exercise in their duty could not differ on a correct disposition of the case." *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 783 (Mo. banc 1999). "If the facts are such that reasonable minds could draw differing conclusions, the issue becomes a question for the jury, and a directed verdict is improper." *Lasky v. Union Elec. Co.*, 936 S.W.2d 797, 801 (Mo. banc 1997). An appellate court will only reverse a jury's verdict for insufficient evidence when there is a complete absence of

---

6. Because Grissom's sexual harassment claims are being remanded for further proceedings, the court will have the opportunity to consider an additional attorney's fee award for Grissom if she prevails. *See* § 213.111.2.

probative facts to support the jury's conclusion. *Giddens v. Kansas City Southern Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). On appeal, we view the evidence and reasonable inferences therefrom in the light most favorable to Grissom, the prevailing party; all contrary evidence and inferences are disregarded. *See D.R. Sherry Constr., Ltd. v. American Family Mut. Ins. Co.*, 316 S.W.3d 899, 907 (Mo. banc 2010); *Hadley*, 265 S.W.3d at 374. Our summary of the evidence has been prepared in accordance with these principles.

In January 2003 when Respondents hired Grissom, she was a wife and mother who had worked more than 10 years in the insurance industry. When Grissom began her employment with Respondents, she started as a customer service representative and agency coordinator. She was not engaged in any direct selling of insurance products. Employees who sold insurance products for Respondents were referred to as "producers." From Grissom's hiring in January 2003 through September 2004, she received positive performance evaluations. In September 2004, Respondents promoted Grissom to the position of insurance producer. As a customer service representative, Grissom had been paid an hourly wage. Once she was promoted to insurance producer, she received a salary based on commissions from the amount of insurance she wrote or sold. The promotion gave Grissom the opportunity to earn more money through selling or writing more insurance.

Shortly after Grissom's promotion to insurance producer, Welker began to engage in unwelcome, humiliating, and unlawful conduct toward Grissom, including attempting to extract sexual favors from Grissom by withholding her commission checks. Welker also sent Grissom emails with pictures of naked men and women engaged in sexual acts. He made frequent humiliating sexual remarks to Grissom about her physical appearance, focusing mainly on her breasts. Welker offered Grissom financial incentives if she would engage in sexual conduct with him. At one point, Welker even physically restrained Grissom's departure from his office in order to continue subjecting her to sexual remarks. Welker then told Grissom that she could leave only if she agreed to grant him sexual favors.

Welker also touched Grissom's body, including her buttocks and breasts, on several occasions without permission. Welker contrived situations for the purpose of displaying pornographic computer images to Grissom. He often directed unwelcome personal questions to Grissom about her sex life, and he made comments to several employees (Grissom included) about his desire to lower a counter in the insurance office so Grissom could set her breasts on top of it.

Grissom continually refused to submit to Welker's sexual advances and requests for sexual favors, and she repeatedly asked him to cease his harassing conduct toward her. Grissom also made numerous complaints to other supervisors and employees, including office manager Laura Green (Green) and fellow producer, Jeremy Anderson (Anderson). Grissom had several conversations with Green about Welker's conduct, and Anderson had actually witnessed some of the conduct. Grissom reported the acts of harassment to other employees, including Marci Walters (Walters), who observed changes in Grissom's emotional state during the harassment, including nervousness and hives.

In order to stop Welker, Grissom consulted an attorney in July 2005. Her attorney wrote the complaint letter to Welker, which demanded that his sexually harassing conduct cease. Walters stood outside Welker's office while Grissom

hand-delivered the complaint letter to Welker on July 22, 2005. According to Grissom, Welker accepted the complaint letter from Grissom, read it, and broke down in tears. He begged Grissom to accept his apology.

Shortly after Grissom delivered the complaint letter, Welker transferred Grissom out of the Sikeston office and sent her to open up a branch office approximately 30 miles away in Dexter, Missouri. Welker did not inform anyone else working for him that Grissom had been given the task of opening a new branch office in Dexter. Instead, several employees, including Green and Anderson, were even led to believe by Welker that Grissom was not showing up for work and shirking her employment duties. In fact, Grissom was going about the work of setting up an office in Dexter, continuing to sell insurance for Respondents and otherwise performing her job duties.

To Grissom's shock and surprise, Welker dispatched Green and Anderson to fire Grissom, terminating her on January 18, 2006, exactly 180 days after Grissom hand-delivered the letter to Welker demanding that he stop sexually harassing her. Green and Anderson informed Grissom that she was being fired because of improper "uploads" of insurance premiums and her alleged neglect of her "computer duties." Later, Respondents largely abandoned the proffered reason relating to Grissom's computer duties and focused instead on the accusation of improper uploading.

Uploading is an insurance-industry practice that occurred on a regular basis in Respondents' offices. When a customer's premium payment was due, Respondents' employees would "upload" the payment from Respondents' operating account over the internet and pay the customer's insurance premium. It was not unusual for the employees to pay for a customer's insur-

ance premium out of the operating account when Respondents had not yet received the payment from a customer. Sometimes, the customer would get a notice from the insurance company that his or her insurance coverage would expire unless a payment was made. If the customer was trustworthy and the employee believed the customer was "good-for-it," then the employee would upload the payment for that customer out of the operating account and wait to be reimbursed by the customer. Like many of Respondents' other employees, Grissom occasionally uploaded payments for her husband's business insurance premiums before he had actually given Grissom a check for them. Grissom provided payment for each and every upload for her husband's insurance shortly after each upload had been made. Grissom never failed to pay her husband's insurance premiums. Grissom was shocked at the allegations of improper uploading made by Green and Anderson, as uploading was a common practice, and Welker himself had been doing business that way for over 40 years.

A little over a week after Grissom's termination, she asked Welker if he would write her a letter of recommendation. Welker complied. The letter stated that Grissom was "customer oriented ... very devoted to her work and her clients, always putting the company and customers first." The recommendation letter made no mention of Respondents' allegations regarding improper uploading or any other alleged impropriety. Grissom also sent Respondents a request for a service letter. Respondents' service letter stated that Grissom was fired for "insubordination." The service letter did not mention anything about improper uploading.

In June 2010, Grissom's claims of retaliation and wrongful discharge were tried to a jury. Grissom's position at trial on these

claims was that she was fired in retaliation for complaining about her sexual harassment by Welker. The jurors heard testimony about Welker's sexual harassment of Grissom from a number of witnesses including Grissom, Walters and Anderson. Respondents argued that Grissom was not fired in retaliation for complaining about Welker's sexual harassment. Instead, they asserted that Grissom was fired for improperly uploading insurance premium payments, particularly for her husband's business, and for failing to reimburse Respondents for those premiums. In response, Grissom presented evidence that: (1) uploading was common practice; (2) she had cancelled checks for all of the uploaded premiums, which proved that the checks had all been deposited and cleared through Respondents' bank account; and (3) Grissom owed no money to Respondents at the time she was fired.

After deliberating, the jury found that Grissom's complaints about sexual harassment to Welker were a contributing factor in her termination, and that, as a direct result of such conduct, Grissom sustained damages. The jury found Welker liable for retaliation and wrongful discharge, and awarded Grissom $25,000 in actual damages and $100,000 in punitive damages. The jury did not find Tri–Star liable. Following the jury's verdict, the trial court entered final judgment in the matter. Welker appealed.

■■■ The MHRA makes it an unlawful discriminatory practice "[t]o retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint...." § 213.070(2). Here, Welker concedes that a *prima facie* case of employment discrimination exists based upon the evidence produced at trial. "If the plaintiff shows a *prima facie* case of employment discrimination, the burden

shifts to the employer to articulate a legitimate, non-discriminatory reason for its conduct." *Murray v. Southwest Missouri Drug Task Force,* 335 S.W.3d 566, 569 n. 7 (Mo.App.2011). "If that happens, the burden shifts back to the plaintiff to show that the proffered justification is merely a pretext for discrimination." *Id.; see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–01, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Midstate Oil Co., Inc. v. Missouri Comm'n on Human Rights,* 679 S.W.2d 842, 845 (Mo. banc 1984). Welker argues that Grissom failed to present any evidence demonstrating that Respondents' stated reason for her termination was pretextual. We disagree.

There is ample evidence that Respondents' stated reason for termination was pretextual. Grissom adduced evidence that uploading was a common practice at Respondents' offices. She presented the cancelled checks for all of the premiums uploaded. All of these checks had been deposited and cleared through Respondents' bank account, which proved that Grissom owed no money to Respondents at the time she was fired. In addition, Respondents' service letter made no mention of improper uploading, stating only that Grissom was fired for "insubordination." Welker's letter of recommendation similarly made no mention of any improprieties in Grissom's conduct. Because Grissom presented sufficient evidence from which a reasonable juror could conclude that Respondents' stated reason for firing Grissom was pretextual, the trial court correctly denied Respondents' motions for directed verdict and for JNOV. Welker's first point is denied.

In Welker's second point, he contends the trial court erred in denying his motion for directed verdict at the close of all of the evidence and his motion for JNOV on the issue of his liability for punitive dam-

ages. Welker argues that Grissom failed to present sufficient evidence of evil motive or reckless indifference on Welker's part to warrant the submission of that issue to the jury. We disagree.

■■■■ Our applicable standard of review is succinctly summarized in *Alhalabi v. Missouri Dept. of Natural Resources,* 300 S.W.3d 518 (Mo.App.2009):

> Section 213.111 provides that the court may award punitive damages to the plaintiff in an action filed pursuant to the MHRA. Whether there is sufficient evidence to support an award of punitive damages is a question of law. We review the evidence presented to determine whether it was sufficient, as a matter of law, to submit the claim for punitive damages. In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility and we disregard all evidence and inferences which are adverse thereto. Only evidence that tends to support the submission should be considered. A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference.

*Id.* at 528–29 (citations omitted). "If a defendant intentionally does a wrongful act, and knows at the time the act was wrongful, it is done wantonly and with a bad motive." *Williams v. Trans States Airlines, Inc.,* 281 S.W.3d 854, 870 (Mo. App.2009). "An evil intent may also be implied from reckless disregard of another's rights and interests." *Id.*; *Claus v. Intrigue Hotels, LLC,* 328 S.W.3d 777, 783 (Mo.App.2010). Viewed most favorably to the submission, Grissom presented the following evidence.

■■■ Welker was the sole owner and ultimate decision-maker for Tri–Star during the entire time period relevant to Grissom's underlying claims. Welker repeatedly sexually harassed Grissom. She described Welker's conduct in detail, including: his sexual remarks; his offers of money for sex; his physical restraint of Grissom for the purpose of coercing her to have sex; his touching of her buttocks and breasts; his display of pornographic computer images; his unwelcome questions about her sex life; his withholding of commission checks because she spurned his sexual advances; his sexually explicit emails to her; and his comments to other employees about Grissom's breasts. Despite Grissom's refusal to submit to his harassing conduct and repeated requests for Welker to stop such conduct, Welker continued his harassing conduct. After receiving the complaint letter, Welker transferred Grissom to Dexter and then waited 180 days—the presumptive time limit for filing a sexual harassment claim—before he fired her. While waiting those 180 days, Welker led Grissom to believe that the harassment would stop and her job was secure. He did not inform any of the other employees that Grissom was opening up the new branch in Dexter. Instead, Welker led several employees, including Green and Anderson, to believe that Grissom was not showing up for work and shirking her employment duties. After waiting the 180 days, Welker then trumped up a reason for firing Grissom. Welker's elaborate deception and attempt to deprive Grissom of her statutory remedies demonstrated both an evil motive and reckless indifference of her statutory rights. *See Claus,* 328 S.W.3d at 782–84 (noting that the proof supporting a plaintiff's underlying claim and an additional claim for punitive damages is not mutually exclusive, and evidence tending to support the underlying claim often permits a reasonable fact-finder to conclude that the defendant acted with an evil motive or reckless indifference). After reviewing the

record, we conclude that there was sufficient evidence from which a reasonable juror could conclude that Welker acted with an evil motive and/or reckless disregard for Grissom's rights. Therefore, the trial court did not err in submitting the issue of Welker's liability for punitive damages to the jury. Welker's second point is denied.

In conclusion, the trial court erred in granting summary judgment on Grissom's sexual harassment claims in Counts I and II of her first amended petition. That portion of the judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.[7] In all other respects, the trial court's judgment is affirmed.

BARNEY and FRANCIS, JJ., concur.

7. Grissom filed a motion for attorney's fees and costs on appeal, which we took with the case. Because Grissom has prevailed on her appeal, she is entitled to an award of attorney's fees and costs pursuant to § 213.111.2. *See Alhalabi*, 300 S.W.3d at 531 n. 7; *Pollock v. Wetterau Food Distribution Group*, 11 S.W.3d 754, 775 (Mo.App.1999) ("the award of attorneys' fees and costs on remand should 'fully compensate' Plaintiff's counsel for prosecuting this matter to final judgment"). We hereby grant Grissom's motion, and direct the trial court to assess reasonable attorney's fees on appeal and enter judgment accordingly. *See, e.g., Myers v. Farm Bureau Town & Country Ins. Co. of Missouri*, 345 S.W.3d 341, 351 (Mo.App.2011).